UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALICE E. O'CONNELL, | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | *  Civil Action No. 15-cv-14027-IT |
| | * |
| TOWN OF TEWKSBURY, et al., | * |
| | * |
| Defendants. | * |

MEMORANDUM & ORDER

September 28, 2018

TALWANI, D.J.

I.  Introduction

Plaintiff Alice O'Connell brought the instant action, alleging that the Town of Tewksbury, the Tewksbury Police Department, and individual Tewksbury police officers (collectively, "Defendants") violated her constitutional and common law rights following a domestic dispute at Plaintiff's home. Before the court is Defendants' Motion for Summary Judgment [#77]. For the following reasons, Defendants' motion is ALLOWED in part and DENIED in part.

II.  Factual Background[1]

For the purposes of summary judgment, the court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in her favor. Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990).

---

[1] The court limits the factual background to those facts necessary to address the pending motion.

On May 24, 2013, at 11:35 a.m., Plaintiff called 911 and stated that she wanted her husband, Thomas O'Connell, "taken out of this house right now . . . He's got Alzheimer's. He's putting his fists up to me again and I'm telling you if he kicks me or anything again, I'm gonna, it's gonna be worse, I'll put something, I'll hit him with something I'll tell you right now. So I want him out of here." Pl.'s Rule 56.1 Statement of Material Facts ("PSOF") ¶ 1 [#85] (quoting PSOF Ex. 1 (O'Connell 911 call recording) [#85-1]). Plaintiff was eighty-two years old at the time, and her husband was eighty-seven years old. Id. ¶¶ 3-4.

Upon arrival at her house, Tewksbury police officers were met by Plaintiff, who stated that her husband was out of control, was "beating her up," and needed to be removed from the house. Id. ¶¶ 3–4; Defs.' Statement of Material Facts ("DSOF") ¶¶ 3-4 [#79]; DSOF Ex. 2 (O'Connell Dep.) 31:5–18 [#79-2]. The police officers came into the house and spoke to Plaintiff and Mr. O'Connell in the kitchen. PSOF Ex. 2 (O'Connell Dep.) 54:12–18 [#85-2]. Plaintiff told the officers that she and Mr. O'Connell had gotten into a verbal argument after he turned off the security lights she had installed on the outside of their house. PSOF ¶ 6; DSOF ¶ 6. Plaintiff further stated that Mr. O'Connell suffered from Alzheimer's, and that she was afraid that he might punch her in the mouth. PSOF ¶ 8–9; DSOF ¶ 8–9. At the time that she was speaking to the police, Plaintiff was agitated at her husband and "might have been" yelling, and told the police that she wanted them to take Mr. O'Connell out of the house. PSOF ¶ 11–14; DSOF ¶¶ 11–14. Mr. O'Connell, however, said that he wanted to stay at the house with Plaintiff. PSOF ¶ 15; DSOF ¶ 15.

Defendants Sergeant Jop ("Sgt. Jop") and Lieutenant Columbus ("Lt. Columbus") took Plaintiff to the porch, leaving Mr. O'Connell in the kitchen with Defendant Officer McMahon ("Off. McMahon"). PSOF ¶ 27; see also PSOF Ex. 3 (Sgt. Jop Dep.) 179:2-5 [#85-3]; PSOF Ex.

2

4 (Off. McMahon Dep.) 25:5–11 [#85-4]. Off. McMahon shut the door between the porch and the kitchen. PSOF ¶¶ 25, 74; DSOF ¶¶ 25, 74; <u>see also</u> Off. McMahon Dep. 25:8–18 [#85-4]. Plaintiff told the police officers that she was Mr. O'Connell's sole caregiver, that she had cared for him for many years, and that he was a good husband. PSOF ¶¶ 16, 18, 21; DSOF ¶¶ 18, 21. She described to the officers that, on more than one occasion, she had heard someone come to the back of her house, which scared her. PSOF ¶ 6; O'Connell Dep.15:12–16:23 [#85-2]. She had recently paid $800 to have security lights installed outside the front and back of her house and had told her husband not to shut off the lights because, "if they come, then I can see or look out the window or do something." PSOF ¶ 6; O'Connell Dep. 15:20–23 [#85-2].

Plaintiff stated that before she went to bed the previous night, she reminded Mr. O'Connell not to turn off the lights because she was afraid. O'Connell Dep. 16:1–14 [#85-2]. She further said that, if he did turn off the lights, "I'm not going to keep you here." <u>Id.</u> at 16:7–10. However, when she got up, she saw that Mr. O'Connell had shut off the lights. PSOF ¶ 7, O'Connell Dep. 49:17–18 [#85-2]. She told the officers that she and Mr. O'Connell got into a disagreement, during which he became increasingly physical. PSOF ¶ 19; DSOF ¶ 19. Plaintiff stated that her husband "put his fists up to me. He was going to start kicking me. I'm not going to leave him there if he's going to do that." O'Connell Dep. 59:1–3 [#85-2]; PSOF ¶¶ 19-20; DSOF ¶¶ 19-20. Plaintiff also told the officers that she had grabbed Mr. O'Connell's wrists tightly "to hold -- to push him back," because he put his fists up to hit her in the mouth. O'Connell Dep. 61:17–18, 122:22–23 [#85-2]; PSOF ¶¶ 36–37; DSOF ¶¶ 36–37. She said that Mr. O'Connell was going to be sorry, and that she was not going to be nice to him anymore, and that she was not going to feed him anymore. PSOF ¶ 22–23; DSOF ¶ 22–23.

Off. McMahon spoke to Mr. O'Connell in the kitchen. PSOF ¶ 30; Off. McMahon Dep.

3

63:15-20 [#85-4]. Mr. O'Connell was relatively calm and quiet. See Off. McMahon Dep. 17:6-12 [#85-4]. During this conversation, Mr. O'Connell told Off. McMahon that he and his wife had always gotten into verbal arguments, but, "this is the first time that she, you know, physically touched me." PSOF ¶¶ 40, 72, Off. McMahon Dep. 23:21–24:2 [#85-4]. Off. McMahon noticed that Mr. O'Connell had a scratch on his right wrist that was bleeding. Off. McMahon Dep. 24:1–2 [#84-4]; PSOF ¶¶ 34, 38, 72; DSOF Ex. 1 (police narrative) [#79-1]. Off. McMahon started to suspect that Plaintiff had assaulted her husband. Off. McMahon Dep. 24:17–19 [#85-4]. Off. McMahon noticed that, unlike Mr. O'Connell, Plaintiff did not have any injuries from her and Mr. O'Connell's earlier interaction. PSOF ¶ 93; Off. McMahon Dep. 30:15-17 [#79-6]; see O'Connell Dep. 35:1–8 [#85-2].

The police did not ask Plaintiff about the scratch on her husband's arm, but she later acknowledged that she "could have scratched him when [she] grabbed his hands to push him away." O'Connell Dep. 61:6-18 [#85-2]; PSOF ¶ 39. Sgt. Jop did not believe Plaintiff's allegation that Mr. O'Connell raised his fists to her or that she was in fear, and decided that Mr. O'Connell had not committed a crime. PSOF ¶¶ 55–57; DSOF ¶ 55-57; Sgt. Jop Dep. 45:3–46:7 [#85-3]. Instead, Sgt. Jop believed that Plaintiff was the primary aggressor and started to question her about whether she cut her husband's hand with a knife. PSOF ¶ 60; Sgt. Jop Dep. 46:3–24 [#85-3]; O'Connell Aff. ¶ 3 [#85-6]. Plaintiff denied cutting her husband's hand with a knife. O'Connell Aff. ¶ 3 [#85-6].

During Sgt. Jop's accusations, the conversation between Sgt. Jop and Plaintiff got heated and argumentative. PSOF ¶ 122. Both Sgt. Jop and Plaintiff accused the other of being "pushy," and Plaintiff told Sgt. Jop not to put words in her mouth. O'Connell Dep. 22:12–24, 70:7–10 [#85-2]; Sgt. Jop Dep. 31:16–32:20 [#85-3]. Plaintiff told Sgt. Jop that she was going to sue

4

him for putting lies in her mouth. PSOF ¶ 270; O'Connell Dep. 89:3–11 [#85-2].

Sgt. Jop decided to arrest Plaintiff for assault and battery. PSOF ¶¶ 61, 201, 203; Sgt. Jop Dep. 69:15–23 [#79-3]. Sgt. Jop grabbed Plaintiff's wrists, turned her around and handcuffed her behind her back. O'Connell Dep. 69:22–70:4 [#85-2]; Sgt. Jop. Dep. 77:16-17 [#85-3]; PSOF ¶¶ 204 – 205.

The handcuffs that Sgt. Jop had placed on Plaintiff's wrists were very tight and caused Plaintiff's wrists to turn red. O'Connell Dep. 52:23–53:10, 72:10–73:18 [#85-2]. Although she complained about the handcuffs, Sgt. Jop did not remove the handcuffs or replace them with a different pair. PSOF ¶¶ 205-206; O'Connell Dep. 52:19–53:10. Sgt. Jop instructed Officer Hanley to transport Plaintiff to the police station in the back of his police cruiser. PSOF ¶ 106; DSOF ¶ 106; DSOF Ex. 8 ("Off. Hanley Dep.") 16:17–17:11 [#79-8]. When Plaintiff got to the Tewksbury police station, one of the police officers took the handcuffs off of her. PSOF ¶ 208. Despite her complaints that her wrists were red, none of the officers paid attention to her. Id.; O'Connell Dep. 52:23–53:10, 72:10–73:10 [#85-2].

At the station, Plaintiff was booked by Lt. Stephens. See PSOF Ex. 12 (Lt. Stephens Dep.) 58:8–24 [#85-12]. While booking her, and throughout the time that she was in custody, no one read Plaintiff her *Miranda* rights. Id.; PSOF ¶¶ 82, 83; see PSOF ¶ 175 (citing Lt. Stephens Dep. 58 [#85-12]; Sgt. Jop Dep. 97 [#85-3]; Off. McMahon Dep. 27 [#85-3]; PSOF Ex. 18 (Lt. Columbus Answer Inter.) #6 [#85-18]). Further, no one advised Plaintiff of her right to use a telephone within one hour of her detention. PSOF ¶ 86; DSOF ¶ 86.

After she was booked, Plaintiff was very upset that she had been arrested. PSOF ¶ 252. The police officers at the station decided to send Plaintiff to Lowell General Hospital for a psychiatric evaluation, despite the fact that she was not suffering from any mental illness and

5

was not a danger to herself. See PSOF Ex. 17 (Section 12 Eval. R.) [#85-17]. Rather, she was sent to the hospital because "[s]he's very very angry." PSOF Ex. 26 (Lt. Stephens Call to Crisis Audiotape) ("[She's] not so much a danger to herself . . . she's very, very angry . . . . Medically, she seems pretty good . . . but just she's very angry").

Plaintiff was handcuffed again while being transported to the hospital for the evaluation. PSOF ¶213; PSOF Ex. 23 (Capuano Dep.) 25:15–19 [#85-23]. However, because Plaintiff was complaining that the handcuffs previously applied were too tight and that she had marks, a different type of handcuff was used during this later transportation to the hospital. See PSOF ¶ 210; Capuano Dep. 24:18–25:7 [#85–23]. While at the hospital, Plaintiff remained handcuffed to the hospital gurney at all times, other than those during which medical personnel were assessing her health. See PSOF ¶¶ 214–220; see also O'Connell Dep. 76:9–12 [#85-2]; PSOF Ex. 17 (Section 12 Evaluation R. 3) [#85-17]; Capuano Dep. 26:1–12 [#85-23].

Once Plaintiff was released from the hospital, she remained handcuffed while being transported back to the police station. O'Connell Dep. 80:22–81:7 [#85-2]. She was bailed out of jail late that same night. Id. at 81:8–10 [#85-2]; see also PSOF ¶ 198. Plaintiff never sought medical attention due to the handcuffs placed on her. O'Connell dep. 53:11–13 [#85-2]; PSOF ¶ 95; DSOF ¶ 95.

Plaintiff was charged with assault and battery and making threats to commit a crime. See PSOF Ex. 7 (Tewksbury Police R. – Off. McMahon narrative) [#85-7]. All charges against Plaintiff were ultimately dismissed. Second Am. Compl. ¶ 212 [#31].

III. Procedural History

Plaintiff's Second Amended Complaint [#31] alleges claims under 42 U.S.C. § 1983; Mass. Gen. Laws c. 12, §11I; false arrest and imprisonment; malicious prosecution; and

6

intentional infliction of emotional distress. Following the close of fact discovery, Defendants filed this Motion for Summary Judgment [#77] and Plaintiff filed her Opposition to Defendants' Motion for Summary Judgment [#84].

IV. Discussion

    A.    Standard of Review

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue is only genuine if there is sufficient evidence to permit a reasonable jury to resolve the point in the nonmoving party's favor." Hope Furnace Assocs., Inc. v. F.D.I.C., 71 F.3d 39, 42–43 (1st Cir. 1995) (internal quotation marks and citation omitted). "A fact is material if it 'might affect the outcome of the suit.'" SEC v. Johnston, 310 F.Supp.3d 265, 269 (D. Mass. 2018) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). However, "the nonmovant may not rest upon mere allegations, but must adduce specific, provable facts demonstrating that there is a triable issue." Brennan v. Hendrigan, 888 F.2d 189, 191 (1st Cir. 1989).

    B.    Probable Cause to Arrest

Defendants argue they are entitled to summary judgment on all of Plaintiff's claims because there was probable cause to arrest Plaintiff, entitling them to qualified immunity. See Defs.' Mem. [#78]. Defendants further argue that because they had probable cause to arrest Plaintiff, they are entitled to summary judgment on Plaintiff's § 1983 claims and common law claims. Id.

The doctrine of qualified immunity "shields government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Alfano v. Lynch, 847 F.3d 71, 75 (1st

7

Cir. 2017) (internal citations omitted). In determining whether a defendant is entitled to qualified immunity, courts must decide: (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right, and (2) if so, whether that right was "clearly established" at the time of the defendant's alleged misconduct. See Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

"In cases applying this [qualified immunity] standard to police arrests in this circuit, an arrest challenged as unsupported by probable cause is deemed 'objectively reasonable' unless 'there is *clearly* no probable cause at the time the arrest was made.'" Topp v. Wolkowski, 994 F.2d 45, 48 (1st Cir. 1994) (alteration in original) (quoting Floyd v. Farrell, 765 F.2d 1, 5 (1st Cir. 1985)). "Th[e] suit may go forward only if the unlawfulness of the arrest would have been apparent to an objectively reasonable officer." Cox v. Hainey, 391 F.3d 25, 31 (1st Cir. 2004).

Applying this standard to the facts presented, Plaintiff has shown that qualified immunity is unwarranted on summary judgment. Defendants state that they had probable cause to arrest Plaintiff for assault and battery and for threatening to commit a crime, see Defs.' Mem. 8–12 [#78]. The test, however, is not whether Defendants subjectively believed that probable cause existed at the time of the arrest, but rather whether an objectively reasonable officer would have found, given the facts in the light most favorable to Plaintiff, that there was probable cause to effectuate an arrest. See Cox, 391 F.3d at 31. Here, probable cause as to both charges rest on disputed issues of material fact as to what occurred when the police were at Plaintiff's residence: who said what, to whom, and when. Taking the disputed facts about these interactions in the light most favorable to Plaintiff—as the court must—a reasonable jury could find that there was clearly no probable cause when she was arrested that Plaintiff committed either of the crimes charged.

Viewing the record through the lens most favorable to Plaintiff, no reasonable police officer could have concluded that there was probable cause to believe that Plaintiff engaged in an unlawful, unjustified touching of her husband rather than in self-defense, see Commonwealth v. McCan, 277 Mass. 199, 203 (1931), or that Plaintiff threatened to commit a crime against him. When Plaintiff called 911, she specifically told the dispatcher that her husband was "putting his fists up to me," and that, "if he kicks me or anything *again* . . . I'll hit him." PSOF ¶ 1 (emphasis added). When the police officers arrived at her house, Plaintiff again told them that her husband had his fists up and was "beating her up." O'Connell Dep. 31:9–18 [#85-2]. While in the kitchen, in the presence of her husband, Plaintiff told the officers that she was afraid that Mr. O'Connell might punch her in the mouth. PSOF ¶¶ 8, 133; DSOF ¶ 8; Tewksbury Police R. – Off. McMahon narrative [#85-7]. At no point did Mr. O'Connell deny that any of this occurred; he simply stated that this was the first time that his wife had physically touched him during an argument. PSOF ¶¶ 40, 72; Off. McMahon Dep. 23:21–24:1 [#85-4].

Although it is undisputed that Mr. O'Connell had a scratch on his hand, PSOF ¶ 38, Mr. O'Connell never said to any of the police officers that Plaintiff scratched him, or even that she intentionally touched him. Cf. DSOF ¶¶ 39, 72. Nor did Plaintiff say to the police at the time that she caused the scratch. O'Connell Dep. 61:12–14 [#85-2]. The only evidence that the police officers had that Plaintiff caused the scratch was that she told the police officers that she grabbed her husband's wrists to push him back *because he had his fists up to hit her in the mouth*. PSOF ¶¶ 37–38; DSOF ¶ 37–38; O'Connell Dep. 122:19–23 [#85-3] (emphasis added).

Further, while Defendants assert that Plaintiff stated that she would stab her husband with a knife if she had to, see DSOF ¶ 10, whether Plaintiff made such a statement is very much in dispute. See PSOF ¶ 10; O'Connell Dep. 45:1–18 [#85-2]. Given that this is a genuine issue of

9

material fact, the court need not delve into the question of whether such a conditional statement constitutes a threat under Massachusetts law, or whether Plaintiff intended that her husband hear the purported threat. Instead, in a situation such as this, where "what the police[] knew prior to the arrest is genuinely in dispute, and if a reasonable officer's perception of probable cause would differ depending on the correct version, that factual dispute must be resolved by a fact finder." Prokey v. Watkins, 942 F.2d 67, 73 (1st Cir. 1991). Therefore, the court cannot conclude on summary judgment that probable cause existed to arrest Plaintiff.

As Defendants' Motion for Summary Judgment [#77] as to Plaintiff's § 1983 claims, false arrest and false imprisonment claim, malicious prosecution, and intentional infliction of emotional distress claims all rely upon the existence of probable cause, the Defendants' motion as to these claims is DENIED.

C. Threats, Intimidation, and Coercion

Defendants further claim that they are entitled to summary judgment on Plaintiff's claims under the Massachusetts Civil Rights Act, M.G.L. c. 12, § 11I, because Plaintiff "has failed to point out any action by the Defendants that would resemble a threat, coercion, or intimidation." Defs.' Mem. 16–17 [#78]. But, similarly, Defendants' motion relies upon disputed issues of fact which depend on credibility judgments more appropriate for a jury. See United States v. Salemme, 2018 WL 3429909 (D. Mass. July 16, 2018) ("The Court does not 'weigh the evidence or make any credibility judgments, as those are left to the jury.'" (quoting United States v. Merlino, 592 F.3d 22, 29 (1st Cir. 2010))).

Accordingly, because there is a genuine issue of material fact, Defendants' Motion for Summary Judgment [#77] as to Plaintiff's claim under M.G.L. § 11I is DENIED.

D.    Excessive Force

Finally, Defendants argue that they are entitled to qualified immunity on Plaintiff's excessive force claim under 42 U.S.C. § 1983 because they used reasonable force to arrest Plaintiff. Defs.' Mem. 12-13 [#78]. Plaintiff's Complaint [#31] and Opposition to Motion for Summary Judgment [#84] are unclear as to whether Plaintiff intended to assert an excessive force claim under § 1983. At the September 18, 2018 summary judgment hearing, Plaintiff's counsel stated that Plaintiff did not intend to assert an independent § 1983 claim for excessive force. Rather, counsel informed the court that Plaintiff intended to use the details of Plaintiff's arrest to support her other § 1983 claims. See Summ. J. Hr'g [#94]. To the extent that Plaintiff's Complaint [#31] could be understood to assert an independent excessive force claim under §1983, Defendants' Motion for Summary Judgment [#77] as to that claim is ALLOWED as unopposed.

IV.    Conclusion

For the aforementioned reasons, Defendants' Motion for Summary Judgment [#77] is ALLOWED in part and DENIED in part.

IT IS SO ORDERED.

Date: September 28, 2018                             /s/ Indira Talwani
                                                    United States District Judge